Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.

**FILED**

Aug 26 2013, 10:51 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**DEIDRE L. MONROE**
Public Defender's Office
Gary, Indiana

ATTORNEYS FOR APPELLEES:

FOR INDIANA DEPARTMENT OF
CHILD SERVICES:
**ALEJANDRO ROSILLO**
DCS Local Office in Lake County
Gary, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

FOR LAKE COUNTY APPOINTED
SPECIAL ADVOCATE:
**DONALD W. WRUCK III**
Wruck Paupore PC
Dyer, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of D.C., Minor Child, and K.C., Mother | ) ) ) ) |
| K.C., | ) ) |
| Appellant-Respondent, | ) ) |
| vs. | ) No. 45A03-1301-JT-22 ) |
| INDIANA DEPARTMENT OF CHILD SERVICES AND LAKE COUNTY COURT APPOINTED SPECIAL ADVOCATE, | ) ) ) ) |
| Appellee-Petitioner. | ) |

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Mary Beth Bonaventura, Judge
Cause No. 45D06-1206-JT-86

**August 26, 2013**
**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

K.C. ("Mother") appeals the involuntary termination of her parental rights,[1] challenging the sufficiency of the evidence supporting the trial court's termination order.

We affirm.

## FACTS AND PROCEDURAL HISTORY

Mother is the parent of D.C., who was born on December 23, 2010. On the day of D.C.'s birth, the Lake County Department of Child Services ("DCS") received a report that Mother was homeless, and both Mother and D.C. would be discharged from the hospital in two days.

DCS learned that Mother suffered from severe mental illness and, following a mental breakdown in 2003, had been court-ordered to live in a group home where her medication could be monitored. Accordingly, for approximately six years prior to D.C.'s birth, Mother lived in a group home setting. During that time, she made no real progress toward reaching independence, largely because she spent most of the time sleeping, a symptom Mother attributed to her medication. Without medication, Mother experienced symptoms of her schizophrenia, including auditory hallucinations, causing her to be conversant in her mind with imaginary friends. At one point, due to her illness, Mother dangerously walked down a busy road, weaving in and out between cars. Ultimately, during her time at the group home, Mother achieved a level two out of seven possible levels of independence, with seven being the most independent.

Approximately one year before D.C. was born, Mother did make an attempt at

---

[1] The parental rights of D.C.'s biological father were also involuntarily terminated, but he does not appeal.

living independently. She left the group home to live with D.C.'s father, who was abusive to Mother and pushed her down the stairs while she was pregnant with D.C. Mother allowed her public assistance to lapse during this time period but, four months prior to D.C.'s birth, Mother returned to a different group home, where staff helped reinstate her public assistance.

DCS also learned that Mother's inability to care for her other child, C.C., caused that child to be removed from her care. DCS further learned that Mother had used crack cocaine until she was four months pregnant with D.C., although Mother later denied this when questioned by DCS and both Mother and D.C. tested negative for illegal substances when D.C. was born.

Based on Mother's background, including that she and D.C. would be homeless upon discharge from the hospital, and that Mother lacked a crib or sufficient clothing for D.C., DCS placed D.C. in foster care on December 25, 2010. The trial court adjudicated D.C. as a Child in Need of Services ("CHINS") on December 28, 2010, after Mother admitted the material allegations in DCS's CHINS Petition. With a plan of reunifying D.C. with Mother, the trial court ordered Mother to: maintain suitable housing; complete a parenting assessment and all recommendations stemming from the parenting assessment; submit to random drug screens; and attend all opportunities for visitation with D.C.

At the time of a subsequent dispositional hearing, Mother was living with her own mother ("Maternal Grandmother"), although the living arrangement was ultimately short-lived. Maternal Grandmother had moved to Indiana from Maine to care for D.C., but

suffered from Multiple Sclerosis, so she could not care for D.C. in the event Mother was unable and, further, Maternal Grandmother lacked transportation, abused alcohol, and tested positive on most of her random drug screens that the court eventually ordered. Maternal Grandmother made Mother leave the residence after a few months. From there, Mother moved in with a man she recently met. At one point, Mother called her DCS case manager and indicated that she and her roommate were arguing a lot. Mother expressed uncertainty as to whether she could live there any longer. However, when follow-up services were offered to Mother, she expressed that she was happy with the arrangement. DCS was concerned because Mother had made the roommate the payee for her monthly social security disability payment.

On March 12, 2012, D.C.'s permanency plan was changed from reunification to termination with adoption, and on June 8, 2012, DCS filed its petition for involuntary termination of parental rights. The court granted the order, determining that, although Mother was generally cooperative with her court-ordered services, she was unable to benefit from the services or independently care for D.C. Mother now appeals.

## DISCUSSION AND DECISION

Mother argues that the evidence does not support the conclusion that her parental rights should have been terminated. We begin our review by acknowledging that this court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App.

4

2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999).

Here, in terminating the parental rights of Mother, the trial court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, then we must affirm. *L.S.*, 717 N.E.2d at 208.

The Fourteenth Amendment to the United States Constitution protects the traditional liberty interest of parents to establish a home and raise their children. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *see also In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *M.B.*, 666 N.E.2d at 76. In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or

5

unwilling to meet his or her parental responsibilities. *K.S.*, 750 N.E.2d at 836. The purpose of terminating parental rights is not to punish parents but to protect their children. *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004).

Before an involuntary termination of parental rights may occur, the State is required to allege and prove, in pertinent part, the following:

> (B) that one (1) of the following is true:
>     (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>     (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>     (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
> (C) termination is in the best interests of the child; [and]
> (D) there is a satisfactory plan for the care and treatment of the child.

*See* Ind. Code § 31-35-2-4(b)(2). Moreover, the State's burden of proof in termination of parental rights cases is one of clear and convincing evidence. Ind. Code § 31-34-12-2; *see also In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009). Clear and convincing evidence need not reveal that the continued custody of the parents is wholly inadequate for the child's very survival. *Bester*, 839 N.E.2d at 148. Rather, it is sufficient to show by clear and convincing evidence that the child's emotional development and physical development are put at risk by the parent's custody. *Id.*

Mother challenges the sufficiency of the evidence supporting the trial court's findings as to subsections (b)(2)(B) and (b)(2)(C) of the termination statute cited above. *See* Ind. Code § 31-35-2-4(b)(2). Each challenge will be discussed in turn.

Under subsection (b)(2)(B), the trial court found that both (i) and (ii) were true.

6

However, because the statute requires proof of but one, we will consider only whether clear and convincing evidence supported the trial court's conclusion that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

In making its determination, the trial court does not need to wait to terminate parental rights until a child is irreversibly influenced by a deficient lifestyle so that her physical, mental, and social growth is permanently impaired. *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). To determine whether there is a reasonable probability that the conditions that resulted in the removal of the child will not be remedied, the trial court should judge a parent's fitness to care for her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001). The trial court must also evaluate a parent's habitual patterns of conduct to determine if there is a substantial probability of future neglect or deprivation of the child. *In re A.B.*, 924 N.E.2d 666, 670 (Ind. Ct. App. 2010).

Among the circumstances that the trial court may properly consider are a parent's criminal history, drug and alcohol abuse, historical failure to provide support, and lack of adequate housing and employment. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Moreover, a trial court "can reasonably consider the services offered by [DCS] to the parent and the parent's response to those services." *Id.* DCS need not rule out all possibilities of change; rather, DCS need establish only that there is a reasonable probability that the parent's behavior will not change. *In re Kay.L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

Here, the trial court noted that Mother suffers from depression and schizophrenia as well as both short-term and long-term memory issues. Mother was court-ordered into a group home to maintain her medication and, after residing there for six years, had not yet reached independence. At the time of D.C.'s birth, Mother had been living at a group home, but was unable to return with D.C., rendering her homeless. The trial court further noted Mother's historical inability to maintain stable housing, resulting in another child being placed with the grandparents pursuant to a guardianship.

With respect to D.C., although Mother was offered individual therapy, parenting classes, parenting assessment, and a parenting coach, the services were ineffective, and, at the time of the termination hearing, Mother lacked the necessary parenting skills. Mother had attended the majority of her visitations with D.C., but the trial court noted that Mother did not bond or interact with D.C., and D.C. would not eat for her. The visitations were stressful on D.C., and the visitations had not improved, despite the presence of a parenting coach each week, with whom the child was more bonded than with Mother. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007). Consistent with our standard of review, the evidence supported the trial court's conclusion that the conditions leading to D.C.'s removal from Mother's care were not remedied.

Mother next contends that, under subsection (b)(2)(C), the evidence was not

8

sufficient to conclude that termination of her parental rights is in the best interest of D.C. *See* Ind. Code § 31-35-2-4(b)(2)(C). In determining what is in a child's best interests, the trial court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). A parent's historical inability to provide a suitable environment along with the parent's current inability to do the same supports a finding that termination of parental rights is in the best interests of the child. *Lang*, 861 N.E.2d at 373.

In addition to the findings set forth previously, establishing that the conditions resulting in D.C.'s removal had not been remedied, the trial court found that Mother was providing no emotional or financial support for the child, and that Mother was "essentially unable to make sound decisions for herself much less a child." *Appellant's App.* at 2. What is more, the trial court observed that Mother did not have stable housing, would move from place to place, moving in with various men and naming them the payee for her disability payments. The trial court found that Mother's pattern of behavior demonstrated that Mother could not make sound decisions, and would jeopardize D.C.'s health and welfare.

In her argument that DCS failed to prove clearly and convincingly that termination of parental rights was in D.C.'s best interests, Mother argues that the trial court failed to address the pain and suffering D.C. would face when D.C. realized she will not have further contact with Mother. Mother's contention appears to be a request for this court to reweigh the evidence, a task we will not undertake on review. *In re C.S.*, 863 N.E.2d 413, 417 (Ind. Ct. App. 2007), *abrogated on other grounds by In re N.E.*, 909 N.E.2d

9

102, 106 (Ind. 2012). Ultimately, the evidence was sufficient to support the trial court's conclusion that termination was in D.C.'s best interests.

Mother does not dispute that DCS has set forth a satisfactory plan for D.C., a final requirement under (b)(2)(D). *See* Ind. Code § 31-35-2-4(b)(2)(D). Therefore, we find that the record clearly and convincingly supports the court's order terminating the parental rights of Mother.

Affirmed.

ROBB, C.J., and RILEY, J., concur.